BERRY v. ATLANTIC WHITE–LEAD & LINSEED–OIL CO.

(Supreme Court, Appellate Division, Second Department. May 7, 1898.)

INJURY TO EMPLOYE—UNHEALTHY EMPLOYMENT—ASSUMPTION OF RISK.

In an action to recover damages for injuries to plaintiff's health, resulting from the dangerous nature of the business of the defendant, a manufacturer of white lead, by whom he was employed, the complaint alleged that defendant, knowing the contrary to be true, had informed him that there was no danger to health from the employment. The dangerous character of the business was admitted. Sponges and handkerchiefs were furnished by the defendant to the workmen, to put in their mouths and over their noses, for protection. Plaintiff testified that he heard the workmen

speak of lead colic, and was warned to "look out for the dust," and noticed that there were cripples among the workmen. The chief engineer testified that he warned the plaintiff, in detail, about washing off lead from his mouth, and to use Pearline. While plaintiff denied recollection of this warning, he admitted using Pearline to wash with. *Held*, on all the evidence, that plaintiff took the risk incident to the employment, and had no right of recovery against the defendant.

Appeal from special term.

Action by Arthur Berry against the Atlantic White-Lead & Linseed-Oil Company. From a judgment dismissing the complaint, and for costs, plaintiff appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, HATCH, and WOODWARD, JJ.

James P. Judge, for appellant.
Charles B. Alexander, for respondent.

GOODRICH, P. J. The complaint alleges that the defendant corporation was engaged in the business of manufacturing white lead in the city of Brooklyn in the year 1890, and that such business, and the process and ingredients therein used, are dangerous to the life and health of all who are employed therein, or in the factory where the business is carried on; that the plaintiff was employed by the defendant as an assistant engineer or machinist in the factory; that the defendant, knowing the danger of such employment, failed to inform the plaintiff thereof, but, on the contrary, informed him that there was no danger or hazard to health from being thus employed in the business; that the plaintiff was ignorant of any such dangerous effects, and, being employed in the factory—

"His system and body became thoroughly permeated, impregnated, and saturated with lead 'poisoning, and other paint poisons peculiar to the business of manufacturing and handling paints, whereby he was and is affected, and has and yet suffers from lead poisoning and its concomitants, and has suffered and continues to suffer great bodily pains and anguish, and has been and is still incapacitated; * * * and that he believes that he is permanently disabled from working."

The defendant, in its answer, denies—

"That the business carried on by it, and the process and ingredients used therein, are dangerous to the life and health of all who are employed therein, or in the factory or premises in which such business is carried on, but, upon information and belief, admits that persons susceptible by nature thereto are, in certain branches and departments of such business, exposed to the danger of lead poisoning, so-called, which danger is a well-known and recognized risk incident to employment in the business of the manufacture of white lead."

The answer also denies that the defendant informed the plaintiff that there was no danger or hazard, or that there was any negligence or disregard of defendant's duty to the plaintiff.

It appears that in July, 1889, the plaintiff's employment commenced, and that it continued until July, 1890, when he was suddenly stricken with paralysis. In the course of his employment, the plaintiff was called upon to do work in all parts of the factory, which was a structure covering $2\frac{1}{2}$ city blocks, and in which were employed four or five hundred people. Both parties admit the dangerous character of

the employment. Sponges and handkerchiefs are furnished by the defendant for the use of the men. The plaintiff testified:

"I don't remember ever seeing any workmen with handkerchiefs over their noses, or sponges over their mouths. I do not mean to say that I never saw any workmen there with sponges in their mouths, or over their mouths. I don't remember ever seeing them. I won't state that I never did, but swear that I don't remember anything about it. As far as that was concerned, I don't remember ever seeing them."

He further testified that he heard the workmen speak of a lead colic, after he had been there some time; that the chief engineer told him, "Harry, look out for the dust, or you will get a buckle in your stomach;" that he had been in the factory nine months before he heard the subject of lead colic spoken of by the officers; that after he had been there several months he heard that there was danger, and noticed that there were several cripples there,—among them, the engineer, who had a crippled hand; and that he was told by him that "he thought it was an affection of the lead,—wrist drop; * * * he told me it was from lead affliction."

Larwill, the defendant's chief engineer, testified that he told the plaintiff—

"To be very careful, and wash himself carefully, and use Pearline, as it was a better solvent than soap to wash lead off, and be particularly careful to wash the lead dust from his mustache, if anywhere around the mouth, and, whenever he got a sweet taste in his mouth, to wash his mouth out. * * * By the Court: Q. What did you ever say to him? A. I told him to be careful about getting lead in his mouth, because, if he swallowed it, it would give him the bellyache, and particularly to be careful about getting lead in under his finger nails, and also to avoid getting anything in his mouth; and it has been my custom to mention to them— '.* * * I remember saying that: 'If you find you have got the bellyache, look at your gums, and see if there are blue lines on them; and, if there are. you had better get some iodide of potash as soon as you can. But I am not allowed to prescribe for you. You better go and see your own doctor.' That is the gist of the thing. It may not be the words."

He also testified that men were made "more or less sick" every week.

It will be observed that the plaintiff simply denies that he has memory of this notice, but admits that he used Pearline to wash with; yet he was not recalled to deny the testimony of the engineer. It is difficult to believe, upon these undisputed facts, with the common knowledge of the danger of lead poisoning, that a workman of ordinary intelligence, employed in a paint factory, and having access and occasion to go to all parts of it, could have been ignorant of the frequent sickness of the workmen, or of the use of sponges and handkerchiefs, or of the precautions taken by the workmen to avoid inhalation of, or contact with, particles of lead. This is not a case of a workman going amid dangers in respect to which he had no knowledge or instruction, and being suddenly injured by some unexpected accident. The common knowledge of men, and a constant opportunity to see the precautions which were observed in the factory, some of which he was directed to observe, the sickness of workmen, and the notice that there was danger from lead dust, which the plaintiff

does not deny, must control us in the decision of this case.   In Crown v. Orr, 140 N. Y. 450, 452, 453, 35 N. E. 648, it was held:

"The master does not insure the servant against all accidents and mishaps that may befall him in the business.   The servant, when he enters into the relation, assumes, not only all the risks incident to such employment, but all dangers which are obvious and apparent.   The law imposes upon him the duty of self-protection, and always assumes that this instinct, so deeply rooted in human nature, will guard him against all risks and dangers incident to the employment, or arising in the course of the business, of which he has knowledge, or the means of knowledge.   If he voluntarily enters into or continues in the service, without objection or complaint, having knowledge or the means of knowing the dangers involved, he is deemed to assume the risk, and to waive any claim for damages against the master in case of personal injury to him. [Citing cases.]   This principle applies to the plaintiff, though he was not at the time of full age.   Like any other servant, he took upon himself the ordinary risks of the service, and all dangers from the use of machinery which were known to him, or obvious to persons of ordinary intelligence.   [Citing cases.]   He is bound to take notice of the ordinary operation of familiar laws, and to govern himself accordingly; and, if he fails to do so, the risk is his own.   He is bound to use his eyes to see that which is open and apparent to any person so using them, and, if he neglects to do so, he cannot charge the consequences upon the master."

In Gates v. State, 128 N. Y. 221, 28 N. E. 373, cited by plaintiff's counsel, the principle is recognized, that, in work of an inherently dangerous nature, the workman is ordinarily held to assume that certain risk which must attend upon its execution, and that such knowledge may be presumed to be possessed by reason of previous employment, or to be suggested by ordinary observation and appearances. There is no sufficient evidence in this case to justify the assumption that paralysis is a necessary concomitant of working in a lead factory. It is not true that all employés in paint factories are attacked with paralysis.   It is not true, even, that all of them are subject to lead colic.   Some persons are more susceptible to this latter trouble than are others, and some are not at all affected.   This may possibly depend upon the precautions taken by some of them to protect themselves from inhalation or contact with poisonous substances.   But it is a well-known fact, of common knowledge, that even a freshly-painted room causes unpleasant results to persons occupying it.   It cannot be assumed that, because one person is subject to this trouble, all others will be; nor can any liability of the defendant in this action be predicated simply upon the fact that the plaintiff's paralysis resulted from lead poisoning.   There is no evidence to show that any other person in the factory was thus injured, although it is true that some of them were more or less affected.   The plaintiff, in entering the employment of the defendant,—an employment concededly dangerous,—took the risk incident thereto, and had no right of recovery against the defendant.   In the unreported case of Lundstrom v. Oil Co., Mr. Justice Bartlett dismissed the complaint, using the following language: .

"Furthermore, I am induced to dismiss the complaint by two other considerations:   The first is that this plaintiff is a man of more than ordinary intelligence, as the position which he at once, or very early acquired in the employment of the defendant indicates; and he is therefore a person to whom the rule peculiarly applies, that the servant assumes all the risks ordinarily incident to the employment.   It might be different if he were a man of great

ignorance, or if the case was one of a child, or a person of such tender age that he could not be expected to have the knowledge which this man shows that he possesses. In the second place, it is impossible for me to resist the conclusion that what this plaintiff says himself he saw in that factory must have impressed his mind with the idea that he was incurring constant danger, even if he did not know it at the outset. The plaintiff himself says, according to my notes, that he was taken ill about a week after he went there, that other workmen told him they were sick, and that he saw these men going about there with sponges over their mouths, and other appliances evidently used for some purpose connected with their work. How he could have seen all this, and not have been put upon inquiry, at least, as to the existence of danger, it is really difficult for me to conceive."

We think this decision fairly summarizes the rights and liabilities of the parties. It may further be observed that, with the exception of another and similar case tried before Mr. Justice Cullen (the unreported case of Farrell v. Manufacturing Co.), where the complaint was also dismissed, no similar action can be found in the Reports of this state. It does not conflict violently with our judicial experience and observation, that, wherever an accident has occurred, willing counsel have been at hand, ready to take up the burden of prosecuting actions for the recovery of damages, wherever it was believed there were reasonable chances for a substantial and compensatory verdict. That only two cases similar to the one at bar can be found of record in this state is not, indeed, controlling, but it affords strong presumption of a consensus of opinion that actions of this character are not maintainable. Certainly it agrees with our views of the defendant's liability.

The complaint was properly dismissed, and the judgment must be affirmed. All concur.

Judgment affirmed, with costs.